## Case No. 6,000.

### HAMMOND v. ALLEN.

[2 Sumn. 387.] [1]

Circuit Court, D. Rhode Island. June Term, 1836.[2]

CANCELLATION OF AGREEMENT—MUTUAL MISTAKE
—CONTRACT VOID BY REASON OF MISTAKE

1. The plaintiff, having a large claim against the government of Portugal, appointed the defendant his attorney, "with power irrevocable," to demand and recover the same, and on 27th January, 1832, entered into an agreement with the defendant to allow him a large sum as commissions on his agreeing to use his utmost efforts for the recovery thereof. At the time this agreement was made, though wholly unknown to both parties, the government of Portugal, by a treaty stipulation dated 19th Jan., 1832, had allowed and liquidated the plaintiff's claim, so that nothing further remained to be done in the premises. *Held*, that this was a case of mutual mistake going to the substance of the contract and making it void, or voidable in equity; and a decree was accordingly made that the agreement above-mentioned be delivered up and cancelled, and that a perpetual injunction issue to prohibit the defendant from asserting any title at law or equity under the same.

[Cited in Mercantile Mut. Ins. Co. v. Folsom, 18 Wall. (85 U. S.) 251.]
[Cited in Wassell v. Reardon, 11 Ark. 705; Hughes v. Mercantile Mut. Ins. Co., 55 N. Y. 265; Ashmead v. McArthur, 67 Pa. St. 328.]
[See note at end of case.]

---

2. In the case above-mentioned nothing but a clear and unequivocal ratification of the agreement, after full deliberation and a complete review of all the material circumstances, would be held satisfactory by a court of equity.
[Cited in Berkmeyer v. Kellerman, 32 Ohio St. 257; Pratt v. Philbrook, 41 Me. 133.]

3. A mistake of facts going to the essence of a contract avoids it.
[Cited in Yates v. Little, Case No. 18,128.]
[Quoted in Dodd v. Gloucester Mut. Fish. Ins. Co., 127 Mass. 152.]
[See note at end of case.]

4. Semble, that, if the power of attorney above-mentioned was intended to be a security, in the nature of a lien, to the defendant for his commissions, it would be a power coupled with an interest, though not so in the ordinary sense of those terms.

5. Semble, that a recovery may be had upon a policy of insurance on a ship or cargo for a certain voyage, where the loss has already occurred at the time of executing the policy, and is unknown to both parties, even though the policy does not contain the common words "lost or not lost."
[Cited in Folsom v. Mercantile Mut. Ins. Co., Case No. 4,902.]

Bill in equity to set aside an agreement founded in a mutual mistake of important facts. The bill prayed, among other things, that a certain power of attorney, and a certain agreement between the complainant and defendant mentioned in the bill, might be decreed to be delivered up to the complainant to be cancelled. The material facts in the pleadings are as follows:

The power of attorney referred to was an irrevocable power from [John] Hammond to [Crawford] Allen, to receive from the government of Portugal, or of the United States, and of and from all and every person and persons whomsoever, a certain claim or demand which said Hammond had for and on account of the capture and condemnation of the American brig Ann, of Boston, and her cargo, on a voyage from New Orleans to Goree (intending to stop and trade at Fayal, Maderia, and Teneriffe), by the Portuguese squadron cruising off the island of Terceia, and condemned by the tribunal sitting at Lisbon, under the authority of the Portuguese government, on the 22d of December, 1831. The agreement was made on the 27th day of January, 1832, between Hammond and Allen, by which Hammond agreed to pay Allen ten per cent. on all sums recovered until the amount should equal 8,000 dollars, and on all sums, over that amount, thirty-three per cent.; and Allen agreed to use his utmost efforts to bring the claim to a favorable issue, and to receive the aforesaid commission in full compensation for his services and expenses, already incurred, or thereafter to be incurred, in prosecuting the claims.

The bill, amongst other things, alleged that on the 19th of January, 1832, in consequence of measures taken by the representatives of the government of the United States, at Lisbon, the Portuguese government recognized and admitted the complainant's claim to the

amount of 33,700 dollars, of which he alleges he was ignorant until the month of March, 1832. That the power of attorney was executed in consequence of certain representations made by Allen, that he could render important services in prosecuting the claim against the Portuguese government, without which services the claim would be lost; and that Allen proposed to Hammond to appoint him his agent; that he was then ignorant his claim had been recognized, and also that the agreement was executed while he remained ignorant of the fact. The bill also charged, that the claim had not been liquidated or paid, in consequence of any interference or exertions of the defendant, or through any agency or influence on his part. That both said instruments were executed without due consideration, and when the complainant was ignorant of the situation of his claim on the Portuguese government. That the contract of January 27th, 1832, "was entered into and executed without any adequate consideration or services to be by the said Crawford Allen paid or performed," under mistaken views and ignorance of the then situation of the complainant's claim; and was hard, unconscionable, and unequal, and ought, on that account, to be set aside, even if said claim had not been liquidated by the Portuguese government, at the time said contract was made and executed. The answer gives the history of the acquaintance between the complainant and defendant; shows the measures to enforce this claim, which the defendant had taken as the agent of the complainant, prior to the execution of the power of attorney; that those measures were approved by the complainant; that the power was read to him; that three copies were executed; and that the complainant saw all the letters which the defendant had received. It alleges that the defendant relinquished all claims for commissions and services, amounting to 268 dollars, then due him; and that the consideration to the complainant for executing said instruments, was the defendant's relinquishment of the immediate payment of the money then in his own hands, of what was then justly due to him for commissions and for services already rendered in regard to the reclamation of said vessel from the Portuguese government, and the agreement on the part of said defendant, to use his "utmost efforts to bring the aforesaid claim to a favorable issue," and to sustain all the expenses in prosecuting said claim. The defendant expressly denies that it was any part of the understanding or agreement between him and the complainant, that the defendant was not to receive said stipulated sums in case there should be little or no trouble in obtaining said money. On the contrary (he states) the understanding and agreement was that the defendant was to receive said sums and no more, even though his trouble and expenses should much exceed said sums, and to receive said sums also if his trouble and expenses should be but very small; and both parties fully understood that the value of the bargain to the defendant depended on these contingencies —and the defendant avers that he had no knowledge at the time of the situation of the claim, except that derived from the letters annexed to his answer, that all the information he had was made known to the complainant and was common to them both; that it was made known to the complainant in conversations and by exhibiting said letters; and he denies that the agreement, when executed, was to depend for its validity on any subsequent information, from any source whatever. "On the contrary, it was fully understood that contingencies like the one which unexpectedly happened, or others of an opposite character, might render the agreement very advantageous, or very disadvantageous to the defendant."

R. W. Greene and Mr. Webster, for plaintiff.

Dorr & Whipple, for defendant.

STORY, Circuit Justice. This cause has been elaborately argued; but, after all, the merits lie in a very narrow compass. The brig Ann and cargo, owned by the plaintiff (who was also master,) was captured by a Portuguese frigate for a supposed violation of the law of nations in April, 1830; and was finally condemned at Lisbon in April, 1831. The plaintiff after the capture went to Lisbon seeking for a restitution of the brig and cargo, and made representations to the American chargé d'affaires there, and procured his interposition with the Portuguese government in his favor. The defendant, Allen, residing at Providence, had been employed by the plaintiff in certain commercial agencies, and had procured insurance on the vessel and cargo for the voyage, on which she was captured; and, as soon as he received information of the capture, he made strong applications to the American government in favor of the plaintiff; and acted for him respecting the adjustment of the insurance. His conduct, after it was made known to the plaintiff was fully approved by him. After the return of the plaintiff, to the United States, and on the 22d of December, 1831, the plaintiff executed a letter of attorney to the defendant, whereby he appointed him his attorney, "with power irrevocable," to demand and recover from the government of Portugal, or of the United States, &c. his claim and demand on account of the capture, with other usual and incidental authorities. Subsequent to this time, and on the 27th of January, 1832, after some conversations between the parties, the defendant having certain moneys in his hands belonging to the plaintiff, and having a claim thereon for antecedent services of various sorts, amounting (as he estimated them,) to the sum of $268, and the plaintiff being desirous to realize the whole of the funds, an agreement

was entered into between them, which constitutes the subject of the present controversy. The agreement, after reciting, that the plaintiff had appointed the defendant his agent for recovering his claims on the Portuguese government, proceeds as follows: "I do hereby agree to pay to the said Allen ten per cent. on all sums, which he may recover, until the amount received shall equal the sum of eight thousand dollars; and upon all sums over the amount of eight thousand dollars so recovered I agree to pay him thirty-three per cent., which commission he is to retain out of any sums recovered." Then follows on the part of Allen the following agreement: "I hereby engage to use my utmost efforts to bring the aforesaid claims to a favorable issue; and that I do agree to receive the aforesaid commission in full compensation for my services and expenses already incurred or hereafter to be incurred in prosecuting the claims." Now, at the time when this agreement was made, though wholly unknown to both parties, the Portuguese government had, by a treaty stipulation dated the nineteenth day of the same month, allowed and liquidated the plaintiff's claim; so that nothing farther remained to be done in the premises. The information of the arrangement was received at Washington in April, 1832. Subsequently one instalment was received and remitted to England, where certain proceedings were had at law and in equity between the plaintiff and defendant, which terminated in an agreement to remit their respective claims to the domestic forum for a final adjudication.

The object of the bill, under these circumstances, is to set aside the agreement as unconscientious, and without consideration, and to place the parties in the position, which they respectively occupied in relation to each other, antecedently to that transaction. The parties certainly stood in a delicate relation to each other at the time of this agreement, that of principal and agent; and I need not say, with what scrupulous fidelity, closeness and vigilance, a court of equity watches over every transaction between them, in common cases, but especially when there is skill, influence, and property on one side, and distress, ignorance, and unmeasured confidence on the other. But considerations of this sort do not require to be more than glanced at on the present occasion, since there is no allegation of fraud, or intentional imposition, or undue advantage set up in the bill. Some suggestion has been, indeed, made in the bill, and it has been followed out in the argument, that the making of the letter of attorney in its terms irrevocable was not understood or assented to by the plaintiff. The bill asserts the ignorance of the plaintiff; the answer, responding to the bill, as expressly insists upon the plaintiff's knowledge of it. The evidence also is clearly on this point favorable to the defendant. Certainly, as this is on all sides admitted to be a case, where there was no intention of the plaintiff to convey

an absolute or a mortgage interest in the property claimed to the defendant, the declaration, that the power was to be irrevocable, must be admitted to be somewhat unusual. But it may have been intended to be a security (in the nature of a lien) to the defendant for his commissions for his services; and then, in a sense, though not in the sense ordinarily given to the terms, it might be construed to be a power coupled with an interest. See Hunt v. Rousmaniere [Case No. 6.898] 8 Wheat. [21 U. S.] 174; Gaussen v. Morton, 10 Barn. & C. 731. But though irrevocable in its terms, it would certainly have been competent for the plaintiff at any time to have revoked the power, by paying all the just commissions for the services of the defendant connected therewith. At present, however, it is no otherwise important in the case, than as it shows the foresight of an intelligent agent, taking an abundant (though not an improper) care of his own interest, and an implicit confidence and devoted trust on the other side.

The real question in the case is whether this is such a case of mutual mistake going to the substance of the contract, as makes it void, or voidable in a court of equity. Now, the very basis of the contract certainly was, that important and valuable services were to be rendered and expenses incurred by the defendant in the future prosecution of the claim. Neither party could have contemplated, that the claim was already settled, or that nothing further was to be done to earn so enormous a compensation. The defendant himself surrenders the point. He admits, that his antecedent services on this and in all other concerns of the plaintiff could not entitle him to more than $268; and that if the actual facts had been known to the plaintiff the present agreement would not have been entered into. The basis then, and the whole basis, of the agreement was a mutual mistake of a fact, constituting the whole consideration of the agreement. Each party supposed, that the claim was unliquidated, and therefore a high compensation ought to be allowed for future services, which would be rendered at the risk and expense of the agent. His compensation for those services was contingent, and dependent upon the successful issue of the claim; and therefore was liberally, not to say profusely, provided for. The whole argument for the defendant rests on the ground, that the possibility of the claim having been already adjusted must have been taken into the account by the parties at the time of the agreement, because it ought to have been taken into the account, and the circumstances naturally led to it. I think, that there is not the slightest evidence to establish the fact, that it was actually taken into the account. On the contrary, the whole transaction manifests, on the part of the plaintiff, an utter despondency as to the future success of the claim; and the stipulation on the part of the defendant is for

future efforts, and future services and future expenses in prosecuting the claim. The casus foederis, if I·may so say, the case contemplated by the parties did not exist.

There is no principle of law more generally admitted than that a mistake of a fact, going to the essence of a contract, avoids it. "Non videntur, qui errant, consentire," is the maxim of the civil law; and it is a maxim of universal justice. The only question, which can arise, is in ascertaining and distinguishing, what is an error or mistake in circumstances, which do not influence the contract, and what is an error or mistake in circumstances, which induce the contract. See 1 Fonbl. Eq. bk. 1, c. 2, § 7, and notes t, v. Pothier has expounded this doctrine with great clearness and precision, and it rests on principles, about which it is difficult to frame a doubt. At least, if a doubt can be stated, it has hitherto been wholly unregarded in equity jurisprudence. Poth. Obl. p. 1, c. 1, note 18. Thus (to put a case stated by Pothier,) if one, with the intention of buying from you a pair of silver candlesticks, were to buy of you a pair of plated candlesticks, you and he both being in mutual error, supposing them to be silver; such a contract would be utterly void. Id. So if A should buy an estate of B, which each supposed to belong to B, and the title of B should turn out to be utterly void, a court of equity would, upon the ground of mutual innocent mistake, constituting the basis of the contract, rescind it. It is wholly unnecessary to introduce farther illustrations of so clear a principle, as firmly fixed in English and American jurisprudence, as it is in the Roman code; and springing from the same general source, the law of natural justice. Now, I confess myself wholly unable to see, how the present case can be extracted from the reach of the principle. It is a case of mutual error, upon a matter of fact, constituting the very basis of the contract, and the whole consideration for it. The ingenious arguments, which have been urged, and the authorities, which have been cited on the present occasion, do not appear to me to establish any solid ground for excepting the present case from the general doctrine. The authorities steer wide of the case. The reasoning, if admissible to its full extent, shakes the very foundation of the general doctrine.

All the cases cited proceed upon a clear distinction. They are cases, where the parties at the time contracted upon equal terms; or where all the facts were, at the time, as the parties supposed them to be, but they were varied by subsequent events; or the parties contracted for the very matter of a contingency, that being of the essence of the contract. I agree that mere inadequacy of price is not per se a ground to set aside a contract fairly entered into by the parties, and having no ingredient of fraud or of a mistake of facts. Mr. Fonblanque (1 Fonbl. Eq. bk. 1, c. 2, § 9, notes d, e)

has well stated the general result of the cases; with which there is no reason to be dissatisfied. And if the consideration involves a contingency, which may happen before the agreement is completely carried into effect, but has not happened, when it is . entered into, that furnishes no ground to rescind it; for the parties take the contingency upon themselves in futuro. But in all these cases, if there is a mutual mistake of material facts; if there is no longer any existing subject-matter of the contract; or if the contingency, though unknown to the parties, is actually determined before the parties have entered into the contract; under all these and the like circumstances, the contract fails in its very basis, and in conscience and equity is held inoperative.

The case has been put of a policy of insurance upon a ship or cargo; and it is asked, whether a recovery may not be had, even if the ship or cargo is lost at the time of executing the policy? Under our policies it·is very certain, that a recovery may be had; for our policies all contain the words "lost or not lost;" the effect of which is, that the underwriter takes upon himself the very risk of a loss at the time, receiving a premium for the whole voyage. Perhaps (for I do not know, that the point has ever directly arisen in our law) the same result would arise upon the true construction of the general words of the policy, without such a clause, as the underwriter receives a premium for the whole voyage, and undertakes the risks of the whole voyage from its commencement to its end; and, therefore, by necessary implication, if the ship is safe at the commencement, he guarantees . her safety from that period. Roccus seems to deduce this conclusion from the nature of the contract of insurance, without any clause on the subject. It may be so. 1 Roccus, Assec. note 51. But then it is upon the clear understanding, that it is a part of the risks' of the contract taken by the underwriter, for which he receives a proportional premium. Pothier and Emerigon admit this to be the foundation of the special rule applied to this class of cases, and, at the same time, acknowledge the general rule in common contracts to be otherwise. See Poth. Traité des Assur. notes 11, 46; 2 Emerig. Ins. c. 15, § 2, p. 154; 1 Marsh. Ins. bk. 1, c. 8, § 2, pp. 332, 333. The same principle applies to the case of the safe arrival of the ship, unknown to both parties. In such a case, at least when the policy contains the clause of "lost or not lost," (to which case Mr. Park confines his affirmance of the doctrine, Park, Ins., 6th Ed. 1809, c. 19, p. 503) the underwriters take all risks upon themselves for the whole voyage; and it is understood, that being so liable, and taking upon themselves all contingencies on account of losses, the assured concedes to them all the benefits of a safe arrival, as an implied result of the contract. But if an insurance were made upon a ship

from a particular day, and she had perished before that day, though unknown to both parties, no one would suppose, that the underwriter was bound for the loss. 2 Emerig. Ins. c. 15, § 2, p. 156; Roccus, Assec. note 57. The reason is clear; the insurance was made under a mutual mistake of a fact, constituting the essence of the contract at the time of its inception. So, if an insurance should be made on goods on board a particular ship, and the premium should be paid; if the assured, acting under a mistake, had no goods on board, the premium would be recoverable back; for the policy never attached, and the insurance was made under a mutual mistake of a fact, constituting the basis of the contract. In short, the principle is (as it is stated by Mr. Park), that if the ship or property insured was never brought within the terms of the written contract, so that the insurer never run any risk, the contract is void, and the premium must be returned. Park, Ins. (6th Ed. 1809) c. 19, p. 503.

The case which trenches most closely upon the distinction here stated, but which in fact turned upon the very distinction, is Earl of March v. Pigot, 5 Burrows, 2802. I do not say, whether that case was, or was not rightly decided; for upon that point grave doubts may be entertained. But the decision there made was upon the ground, that though the actual death of the father of either of the parties was not then in contemplation of either of them, it was, as an unknown event, wholly immaterial, in the view of both, to the essence of their contract. "If (said Lord Mansfield), it (the fact of such death) had been thought of, it would not have made any difference in the act; and there is no reason to presume, that they would have excepted it." That cannot be presumed in the present case; for the very basis of the contract is an existing contingency, and future services and expenses. In Mortimer v. Capper, 1 Brown, Ch. 156, the bargain proceeded upon no mistake of existing facts; and it was sought to be set aside upon events subsequently occurring. The case of the mine, in Fox v. Mackreth, 2 Brown, Ch. 420, was not a case of a mutual mistake of a fact, vital, in the opinion of both parties, to the essence of the contract. The sale of the land necessarily included a sale of all below its surface; and, consequently, the vendor must necessarily have contemplated, that it included mines as well as common soil. But suppose both parties had contracted under a mutual mistake, that there was no mine, as the basis of their contract, would the conclusion have been the same? Certainly not; any more than if they had contracted under a mutual mistake, that there was a mine, and there was none. In the case of City of London v. Richmond, 2 Vern. 421, the only question was, whether a court of equity should refuse to decree a specific performance of a bargain simply, because it was a losing bargain, the rent reserved being £700,

the real value not more than £300. No fraud or mistake of fact was pretended. In Ramsbottom v. Parker, 6 Madd. 6, the question was, whether a contract by one partner, on retiring from the partnership, to pay a particular sum of money, and be discharged from all debts thereof, should be set aside, because it turned out by subsequent events, that his share of the debts would have been more than ten times as large a sum. The court said, that there could be no such relief, where the advantage or disadvantage of the contract was to be the result of future contingencies, and was not within the view of the parties at the time. But, suppose all the partners at the time had, by mistake, understood, that the whole debts were but £5,000; and that this was the basis of their contract; and it turned out, that instead of being £5,000, they were £30,000; it is clear, that the contract must have been set aside, as founded in mutual mistake. See, on a similar point, 1 Domat, bk. 1, tit. 1, § 4, art. 21.

These are the most important cases on this subject, which have been cited by the counsel for the defendant. They all fall short of the point, on which the present case hinges; and are distinguishable from it in most material circumstances. In my judgment, they leave the case of the plaintiff untouched, upon its original ground of a mutual mistake of facts, constituting the very basis of the contract. But it is said, that there has been a full ratification of the contract by the plaintiff, with a full knowledge of all the circumstances. It is wholly unnecessary for me to go into a minute examination of the acts relied upon to establish such a ratification. All, I need say, is, that I can perceive no sufficient grounds in any part of the evidence to establish it as a matter of fact. And, in a case of this sort, nothing but a clear and unequivocal ratification, after full deliberation, and a complete review of all the material circumstances, ought to be held satisfactory by a court of equity.

My opinion, therefore, is, that the plaintiff is entitled to have a decree, that the agreement of the 27th of January, 1832, be delivered up and cancelled, and that a perpetual injunction issue to prohibit the defendant, from asserting any title at law, or in equity, under the same. But this decree ought to be upon the terms, that the plaintiff bring into court, to be paid over to the defendant, upon his compliance with this decree, the sum of $268, with interest on the same, from the 27th day of January, 1832, which the defendant asserts to be a compensation due to him, and which is not put into contestation on the other side. I think, also, under all the circumstances, there should be no costs to either party.

[From this decree the defendant appealed to the supreme court. 11 Pet. (36 U. S.) 63. In an opinion by Mr. Justice McLean, the decree was affirmed, upon the ground of the strong eq-

uity in the case of the complainant. "The contract was entered into through the mistake of both parties; it imposes great hardship and injustice on the appellee, and it is without consideration."] ·

HAMMOND (ASTROM v.). See Case No. 596.

HAMMOND (BROCKETT v.). See Case No. 1,916.

HAMMOND (BURBANK v.). See Case No. 2,137.

HAMMOND (COOK v.). See Case No. 3,159.